WILLIAM H. RUTAN, The (MONTELL v.). See Case No. 9,724.

---

# Case No. 17,697.

## The WILLIAM JARVIS.

### [1 Spr. 485.] [1]

District Court, D. Massachusetts. June, 1859.

CONTRACT OF SEAMAN — SUIT FOR WAGES — PROCEEDING AGAINST VESSEL — PORT OF DISCHARGE—PROCESS—ISSUE BY CLERK.

1. The rules of evidence in admiralty cannot be changed by a state statute.

2. A voyage described in the shipping articles was from "Havre to New Orleans, and thence to one or more ports in Europe, and finally back to a port of discharge in the United States, for a period not exceeding twelve calendar months." *Held*, that there were two restrictions, one of time, and the other of ports: and that the seamen were not bound for twelve months, unless the vessel went to the ports in the order described.

3. By their contract, the seamen were bound until the vessel should return "to a final port of discharge in the United States."

4. She returned to New Orleans, the only port to which she was then destined, and her cargo was there wholly discharged. *Held*, that New Orleans was the final port of discharge in the United States.

5. Requiring the seamen to serve from New Orleans to Boston, was a violation of their rights, for which they were entitled to an indemnity.

6. Section 101 of the chapter of the Revised Statutes of Louisiana, entitled "The Black Code," respecting colored seamen, is unconstitutional.

7. The right of a seaman to his wages is perfect, upon the completion of his service.

8. Before St. 1790, c. 29, § 6, if payment was refused, he could have instantly commenced a suit in personam against the owners or master, or in rem against the vessel or freight.

---

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

9. The statute affects only one of these remedies, viz., that against the vessel. It does not touch suits in personam, or against the freight.

10. By the statute, as a general rule, no proceedings can be had against the vessel, until ten days after the right to wages has accrued.

11. But there are three events in which such proceedings may be had within the ten days, viz.: (1) If a dispute has arisen. (2) If the vessel has departed from the port of her discharge. (3) If she is about to proceed to sea. In the last two cases, the statute is inoperative, and the right to process is the same as if it had never been passed.

[Cited in The Shelbourne, 30 Fed. 512.]

12. The expiration of ten days, and a dispute having arisen, are by the act made equivalent to each other. And upon the happening of either, the proceeding by summons to the master is authorized, but not required.

13. It is optional with the seamen whether to resort to the preliminary measure of summoning the master, or to make direct application for admiralty process. And the judge may order process against the vessel, without previous summons to the master.

[Cited in The M. W. Wright, Case No. 9,983; The Waverly, Id. 17,301; Murray v. Ferry-Boat, 2 Fed. 88; The Frank C. Barker, 19 Fed. 334.]

14. In the absence of the judge, the clerk may issue process according to rules prescribed, or instructions given by the judge.

In admiralty.

W. E. P. Smyth, for libellants.
J. H. Prince, for claimant.

SPRAGUE, District Judge. This is a libel for seamen's wages, on a voyage from New Orleans to Havre, thence to New Orleans, and thence to Boston.

The first question is, what was the contract rate of monthly wages? Some of the libellants claim more than is set down in the shipping articles. Each of the libellants was offered, as a witness in his own behalf, the counsel contending that he was admissible by statute of Massachusetts of 1857, c. 305. It was decided in this court, in U. S. v. Dunham [Case No. 15,006], and afterwards in the circuit court, that the rule of evidence prescribed by that statute must prevail in the courts of the United States, in trials at common law. But it has also been decided, in this court, that it does not prevail in suits in admiralty. And it has been held by the supreme court, in U. S. v. Reid, 12 How. [53 U. S.] 361, that a state statute cannot change the rules of evidence, in criminal trials, in the courts of the United States, they not being deemed trials at common law, within the meaning of the thirty-fourth section of the judiciary act of 1789 (1 Stat. 92). The testimony of each libellant in his own case was, therefore, rejected, and there is no sufficient evidence that a fraud was practised upon any of the libellants, in the insertion of the rate of wages in the articles.

The second ground of claim is, that the voyage from New Orleans to Boston was performed without any contract, either written or verbal, and that the seamen were wrongfully coerced to remain in the service of the ship.

Some of the libellants shipped at New Orleans, in September, 1858. The voyage described in their shipping articles was from "New Orleans to Havre, and one, two, three or four other ports, should the master require, and back to a final port of discharge in the United States." The rest of the libellants shipped at Havre. The voyage described in their articles was from "Havre to New Orleans, thence to one or more ports in Europe, and finally back to a port of discharge in the United States, for a period not exceeding twelve calendar months." The ship went from Havre to New Orleans, and thence to Boston. She arrived in New Orleans on the 9th of February, 1859. The crew consisted wholly of colored men, who, by the laws of Louisiana, are not permitted to be at large on shore, and might even be taken from their vessel and imprisoned; and the master was compelled to give bond to carry them out of the state. Some of the crew requested their discharge at New Orleans, and to be transferred to some other vessel. This was refused by the master, and all were required to continue in the service of the ship, and did so continue, until her arrival at Boston, on the 21st day of May, 1859. As to those who shipped at Havre, it is contended that they were bound for twelve months. But they were thus bound only for the voyages described in the articles, which contain two restrictions. First of places, and second of time. Boston was not one of the places embraced in their contract, unless it should be the port of discharge in the United States, after a second voyage to Europe, which was not performed. As to those who shipped originally at New Orleans, it is contended that Boston was the final port of discharge in the United States, within the meaning of their contract. But this construction cannot be maintained. This ship took no cargo at Havre, excepting a small quantity of potatoes, which were all discharged at New Orleans. If she had taken on board goods for different ports, to which she was bound successively for the discharge of cargo, then there would have been reason to contend that the last of such ports, in the United States, was the final port of discharge, within the meaning of the contract. U. S. v. Barker [Case No. 14,516]. But in this case, so far from there being cargo to be discharged at several places, the vessel was not even destined to any port, excepting New Orleans; she went there seeking business, and ready to accept it for any part of the world.

Another ground of defence is, that these libellants being negroes, the master was compelled, under a law of Louisiana, to give bond to carry them out of the state. The provisions of that statute are referred to in The Cynosure [Id. 3,529]. It was there held, that this law of Louisiana was invalid, and to that opinion I still adhere. It is there said to be inconsistent with the constitution and laws of the United States respecting commerce. And it may be added that this view is sustained by the leading case of Gibbons v. Ogden, 9

Wheat. [22 U. S.] 1, and by the established doctrine of the supreme court. In that case it was decided that commerce embraced navigation. All the numerous acts of congress respecting ships and their crews, in defining the rights and duties of merchant seamen, have emanated from the power to regulate commerce. It was further decided, in the same case, that a state could pass no law affecting navigation; in part, on the supposition that such cases were not covered by the legislation of congress. For in this respect commerce was to be deemed a unit, and what congress had not seen fit to restrict, they had permitted, and this tacit permission was to be considered a part of the system of regulation which congress had established, and of the same force as if it had been expressly enacted. It is of no avail, therefore, to say that congress have not, in express terms, said that negroes may be seamen on board of American vessels. It is sufficient that there is no prohibition, and that all persons, of every shade of color, stand upon the same ground of right to constitute a part of the crew. And this unrestricted permission is as perfect as if it had been given by positive enactment. The master could not, therefore, by giving his bond to the state authorities, whether done voluntarily, or by illegal compulsion. acquire any right to control their persons, still less to compel them to serve on board of his ship. No one of the libellants ever agreed to go from New Orleans to Boston. And the master, in requiring their services on that voyage, violated their rights, and they are entitled to recover an indemnity therefor.

This ship arrived in Boston on the 21st day of May, and the crew were immediately discharged. On the 23d, they went to the master for their wages, who offered to pay them for the whole time, at the rate prescribed in the articles. This they refused to accept, claiming a greater rate from New Orleans to Boston, and some of them, also, a greater rate between New Orleans and Havre. On the 25th, application was made to this court for admiralty process against the vessel, which, after due examination, was awarded, and she was arrested. It is insisted, that this arrest was premature: (1) Because it was within ten days after the seamen were discharged; and (2) because there was no previous notice to the master, to show cause why admiralty process should not issue. These objections are founded on the sixth section of the statute of 1790, c. 29 [1 Stat. 133]. This section has been very perplexing to the courts. It has often been regarded as a sort of legislative enigma,—an inexplicable enactment for inscrutable reasons. Upon examining this sixth section. it is found that its provisions do not affect the right to wages, but only the remedy. To understand the statute. we must see when the right accrues. and what were the remedies previously existing. The right to wages accrues when the contract has been performed. Formerly. the practice was to hold the

seamen to assist in unloading the ship, and his service was not terminated, until the cargo was fully discharged. Now, he is almost invariably discharged at the termination of the voyage. This sometimes has arisen from the express terms of his contract; sometimes from the established usage of the port where the voyage terminates, which tacitly becomes a part of the contract; and sometimes from a discharge by mutual agreement. But, in all these cases, his right to wages is perfect when his contract has been performed, whether that be when the voyage is ended, or not until the cargo is unlivered. If such wages were not paid upon demand, the law immediately gave him several remedies, viz., in personam against the master or owners, either in admiralty or at common law, or in rem, against the ship or freight, in admiralty. The question arises, how far does the statute affect these remedies? I am not aware that it has ever been contended that it curtailed the right to proceed at common law, or that any particular question has arisen, or discussion been had as to process against freight.

But questions and discussions have arisen, as to the time when seamen may proceed against the vessel, or in personam in the admiralty. It is admitted that, as a general rule, process against the vessel is delayed for ten days, although the statute does not say this, in express terms. It recognizes the immediate right to wages, upon the discharge of the cargo; and then says, if they are not paid within ten days, &c., a monition may be had to show cause why process should not issue against the vessel. This has been considered as impliedly prohibiting any proceedings against the vessel, within ten days. But the act itself makes three exceptions to the general rule of delay: (1) Where a dispute has arisen as to the wages. (2) When the vessel shall have left the port where the voyage ended. (3) When she shall be about to proceed to sea within the ten days. It has been maintained by very respectable authority (1) that the ten days' restriction applies to suits in personam in the admiralty, as well as to process against the vessel; (2) that the first exception, viz., the clause respecting a dispute. can have no efficacy, and must be wholly disregarded; (3) that neither after the expiration of the ten days, nor in the excepted cases, can process to arrest be issued, without the previous summons to the master to show cause; in other words, that there must be such previous summons in all cases, before the vessel can be arrested.

The last two of these propositions are now directly before me for adjudication, and I am called upon to consider the arguments which have been adduced in their support. The same reasons apply. in a great measure. to the first. The judges and writers who have maintained these propositions. do not seem to have confined themselves to the language of the legislature, cr to have scrutinized it with much care. but to have rested their conclusions upon certain supposed reasons and objects of the legis-

lature. Judge Peters (Edwards v. The Susan [Case No. 4,299]); and after him, Mr. Dunlap, in his Admiralty Practice (page 96); and after him Judge Conkling (Adm. Prac. p. 393), maintain, that the reason and purpose of the legislature in giving the ten days' delay, are to enable the owner of the vessel to ascertain whether there has been any embezzlement by the crew, and to collect freight wherewith to pay the wages, and that this reason applies as well to a suit in personam as in rem. And it may be added, that it applies as well to process against the freight, as against the vessel, and to suits at common law, as well as in the admiralty. But this supposed reason is a mere assumption, to which the statute gives no color, but the contrary. It is assumed. that the statute gives the ten days in order that the owner may have an opportunity to examine the cargo, and see if it is intact, and to collect the freight to pay the wages. Now the statute contemplates that the ten days shall not begin, until the cargo has been fully discharged. It was framed with reference to the practice then existing, by which the seamen continued their service until the cargo had been unlivered. The language is, "As soon as  *   *   *   the cargo or ballast be fully discharged  *   *   *  every seaman shall be entitled to the wages which shall be then due, according to his contract, and if such wages shall not be paid within ten days after such discharge" of the cargo, &c. Now the complete discharge of the cargo by the owner himself, gives him the fullest opportunity to ascertain its condition, and to see if there has been any embezzlement. It also gives him time to collect the greater portion of the freight, and at least the fractional part, that would suffice to pay the wages of the mariners. Owners of cargo almost invariably take it away as soon as it is placed upon the wharf. They are anxious to obtain possession of their property. and the carrier is not bound to deliver it, until freight be paid. But even if the owner had no opportunity to collect freight. is it credible that the legislature could intend that the seaman, after complete performance of his contract. and after his right to compensation was perfect. should be turned ashore, penniless and friendless, (as he commonly is,) and kept for ten days, without payment of any portion of his wages, and this, too, merely from tenderness to his employer, who could. in general, make instant payment. without the slightest inconvenience? Besides this, the statute expressly preserves the right to proceed by suit at common law. And this is just as incompatible with giving time to examine the cargo, and to collect freight, as would be any suit in the admiralty. And it may be safely said. that no reason can be assigned for permitting a suit at common law, which would not apply with equal force to allowing it in personam in the admiralty, which, indeed, is the more appropriate and favored remedy for seamen. because more promptly meeting their necessities.

Another and quite different reason has been assigned by one learned judge, for depriving a seaman of an immediate remedy, viz., that it is for his benefit, by preventing his involving. himself too readily in the evils of litigation. Conk. Adm. Prac. 404. This argument goes in support of all the propositions for delay. It has generally been considered the duty of government to administer justice promptly and without delay, and this injunction has even been incorporated into state constitutions. If the reverse be the true principle, if the right to sue should be withheld. to prevent the evils of litigation, why not extend it to other persons, as well as to seamen? Would it be peculiarly beneficial to the latter? So far from it, that there is no class upon whom delay inflicts such cruel injustice. Laborers, to whom wages are due for services on land. have homes, friends, or at least acquaintances, but a seaman is generally put ashore a destitute. homeless stranger, with nothing but his claim for wages on which to subsist. If they are withheld, he is driven to dispose of his claim. and with what sacrifice this will be done, has been often made manifest in judicial proceedings. Cases have been presented, in which the whole claim for years of service, has been transferred by the seaman. within two days after his discharge, upon his receiving less than a third of what was due to him. Generally. the master or owners recognize the necessities of the seaman, and have been honorably prompt in the payment of his wages. But this is by no means universal. They have sometimes used their supposed right to withhold the wages for ten days, as a means of coercing the seaman into the relinquishment of valuable claims against the owners, or officers, for violations of contract, or for personal violence. That seamen can, of all persons. least bear the evils of delay, is manifest from their character, and their employment. This has been universally recognized. It is for this reason that, in case of seamen's wages, the admiralty is emphatically an instance court. velatis velis. Even the English courts of common law, while obdurately prohibiting nearly all other suits, have permitted seamen to proceed in the admiralty for their wages, as an indulgence to their necessities.

I have discussed these reasons at some length. not only because of the authority by which they have been put forth. but because they have aided in producing a general belief, particularly among ship-owners. that the seamen can commence no suit, and that the owners are under no legal obligation to pay the wages, until after the expiration of ten days. It seems to me that, if we are content to look to the language of the statute, and its fair interpretation. without seeking to enlarge its construction, from an assumed theory of the purposes of the legislature, many of the supposed difficulties will vanish. And surely we ought not to go in search of arguments for giving a strained construction against the seaman, of a statute which does him injustice. by curtailing the remedies which the jurisprudence of all other countries has given him. And we must also bear in mind, that we are dealing with remedies for

the collection of debts, which justice requires should be prompt and efficient, even where our sympathies are excited by the embarrassment of the debtor, and where the creditor has abundant means. But in case of seamen, the creditor generally is in distress, and the debtor of ability. And there is certainly no sufficient reason for peculiar tenderness to such a debtor, at the expense of such a creditor. The reason of the provision for delay, deduced from the statute itself, is simply the apprehension that ship-owners might suffer great inconvenience from having their vessels arrested, and held upon trifling demands of seamen. This reason applies peculiarly to vessels; it does not extend with equal force to suits against the freight, or in personam; and hence, the statute has provided only for delay in arresting the vessel. And even to this delay there are three exceptions: two to prevent the loss of this remedy, and the other to prevent delay, where the right is contested.

I am aware that this view is in opposition to very respectable authority. In Swift v. The Happy Return [Case No. 13,697], it is said, that the wages are "not payable until the expiration of the period allowed for collecting the freight," i. e., until after the ten days. If not payable, no suit could be commenced. And in Dunl. Adm. Prac. p. 100, it is said, that suits in the admiralty, in personam, for wages, cannot be commenced until after the lapse of ten days from the discharge of the cargo. There is no such restriction in the statute, and it has often been held, in admiralty, as well as at common law, that suits in personam may be instituted immediately after the discharge of the seaman, and a refusal of payment of his wages. The enacting clause exhausts itself upon the process against the vessel, and it is only from the proviso that any argument can be drawn, to restrain proceedings in personam. But the office of the proviso is to limit, and not to enlarge the enactment. It may be asked why it is declared that nothing therein shall prevent the seaman from having a suit at common law, if no suit in personam had been affected by the previous clauses? To this I must answer, that I do not see any necessity for such a proviso. It may have been from superabundant caution. But inability to perceive any necessity for the proviso, cannot change the palpable fact of what is previously written; and that there is not a word in it that touches, or even glances at any proceeding in personam. And there are not wanting precedents of provisos, equally inexplicable, but which have not been permitted to enlarge the enactment.

I come now more directly to consider the clause in the statute, respecting disputes. It is admitted that a dispute had arisen in the present case, but it is insisted that the process was premature, because that provision of the statute is wholly inoperative. And Dunl. Adm. Prac. p. 100, and Conk. Adm. Prac. p. 393, are cited as authorities. I cannot, however, accede to the doctrine therein stated. The statute says: "If such wages shall

not be paid within ten days after such discharge (of the cargo), or if any dispute shall arise between the master and the seamen," &c., application may be made for process. But it is contended in Dunlap, that if the seaman may institute process, by reason of a dispute, the ten days' restriction will be nugatory, because he can create a dispute at pleasure; and he concludes that the court must either abrogate the clause respecting disputes, or permit the seamen to nullify the ten days' restriction. But no such necessity exists. His theory is that the seaman will make an exaggerated demand, for the mere purpose of causing a dispute. I do not understand that it is apprehended that he will make a claim wholly fictitious, knowing that nothing is due to him, for he has no more temptation to do this before, than after the expiration of the ten days. In either case, the only result would be total failure in his suit, and a loss of all the expenses incurred, and a liability to pay costs to the other party. But the apprehension must be, that having a just claim for a certain sum, which is not denied by the master, the seaman may wilfully exaggerate the amount, for the mere purpose of creating a dispute, in order to obtain process. But against this there are sufficient guards. In the first place, before the judge will order the arrest of the vessel, he must be satisfied that there is a real dispute, and sufficient grounds for process; and to this end will require evidence upon oath. In the next place, the seaman must fail in his suit, so far as there is any matter in controversy, and must therefore pay all the expenses which he has incurred, and may be mulcted in costs to the other party, to be deducted from the amount admitted to be due; or the proctor, if colluding or aiding in the supposed evasion of the law, may be compelled to pay the costs out of his own pocket, or otherwise dealt with, for malpractice. The power of the court over the cause, the costs, and the proctor, is sufficient to prevent, or correct, the apprehended fraud upon the law. Beside this, there is really no inducement for a party thus to make a false claim, and commence litigation thereon. So far from gaining time, he will be delayed, until the termination of the litigation, and then obtain only the amount originally admitted to be due, less the costs to which he may be subjected. The danger of such a procedure is imaginary. I have never known a case of such fictitious dispute, and the fear of it, certainly, will not justify a judicial repeal of this clear and substantive provision of the statute.

It remains to consider the further objection, that the arrest of the vessel was premature, because there was no previous summons to the master, to show cause why admiralty process should not issue. And it is insisted that, neither after the expiration of the ten days, nor in the excepted cases, can admiralty process issue, without the preliminary summons to the master, to show

cause; in other words, that such summons is, in all cases, an indispensable pre-requisite. This presents a question of more difficulty than the preceding. It has been held by a learned author and judge (Conk. Adm. Prac. 395) that such previous notice is necessary, even in case the vessel shall be about to proceed to sea. To this I can by no means accede. Before the statute, the seaman had a right to immediate process. The enacting part of the sixth section authorizes a summons after ten days, or a dispute. It is only by virtue of this enactment, that the previous right to immediate process can be impaired. But the close of the same section says, in terms, that nothing herein contained shall prevent the seaman from having immediate process, out of any court, in case the vessel is about to proceed to sea. How, then, can it be said, that what precedes in the same section shall prevent immediate process in such case? There are four events specified in the sixth section: (1) The expiration of the ten days. (2) A dispute has arisen. (3) The vessel having departed from the port where she was discharged. (4) Being about to proceed to sea. The last two are contained in the proviso which takes them out of the enactment, and leaves them precisely as they were before the statute. It is the first two that require consideration.

Before the statute, the seaman had no right to this summons to show cause. It is a new proceeding, and whoever avails himself of it, can do so only in the manner expressly set forth. And if the process to arrest the vessel owed its existence to this statute, it could be had only in the manner therein mentioned, that is, after the notice to the master. But the right to the process existed previously, and the question is, how far the statute has impaired it. It is agreed that it is postponed for the ten days. Is it further delayed until after the proceedings on summons to the master? The language of the statute is enabling, not prohibitory. It says that a proceeding by summons may be had after ten days, but does not forbid process to arrest. The prior law is not expressly repealed. Is it repealed by implication? To the extent of the ten days it is. Because, if two modes of proceeding are given by law, one to arrest, and the other a summons to show cause why there should not be an arrest, it would be absurd that the milder measure of the summons should not be permitted, until after ten days, and allow the arrest itself to be made, without such delay. But no such absurdity exists in allowing the party, after the expiration of the ten days, to have his election which of the two proceedings he will at once resort to. The new right given to the seaman, to proceed by summons to the master, is not incompatible with his previous right to proceed immediately by process to arrest. It is but giving him an option of remedies. That there is no incompatibility, has been

practically demonstrated: for some courts have always allowed this option to the seaman, without difficulty or inconvenience. The former law is not in this respect repealed, either in terms, or by its incompatibility with the new provisions of the statute. If we take more general views, either of policy or justice, we find no grounds for saying that it was the intention of the legislature to take away the right of immediate arrest, after the ten days. The language authorizing the summons is, "It shall be lawful," &c. If this is merely enabling, that is, if it be optional whether to resort to this proceeding, or not, then the provision may be of some benefit to the seaman, and some slight compensation for the injustice of the ten days' delay; but if it is imperative upon the seaman to go through the process of summoning the master, before he can have a warrant of arrest, it will be an additional injustice. The principal benefit to the seaman from this provision for summoning the master is that he sometimes has the pecuniary means of instituting this proceeding, but not to arrest and hold the vessel. And if the master failed to show cause why admiralty process should not issue, it may inspire his proctor or others, with sufficient confidence in his claim, to become responsible for the expense of an arrest. And in some few cases, this procedure may be resorted to, in order to ascertain the objections to the claim. But these are almost always well known, and where they are not, it is generally vain to expect that disclosure on summons, which has been refused in pais. It sometimes happens, too, that the parties are willing to abide by the opinion of the judge, upon an application. But this is voluntary, for he can decide nothing, except whether a suit in rem shall then be commenced; and his refusal does not preclude a renewal of the application, and his allowing it will have no effect upon the trial, which will proceed in the same manner as if there had been no such previous summons.

But this procedure of summoning the master is, in general, wholly useless. It does not begin until after a dispute has arisen, or, at least, payment has been refused, and litigation has become necessary, and then the more directly and speedily the question is brought to an issue, the better. The multiplication of unnecessary processes is an evil: they create delay and expense. The delay is too palpable to be denied: but one learned writer indulges the idea, that there need be little or no expense, because the seaman may, without any assistance, himself carry through this procedure of summoning the master to show cause, attend the hearing before the judge, or magistrate, and obtain the certificate. Conk. Adm. Prac. 398. The idea that a common sailor, who, very often, can neither read nor write, and not unfrequently cannot speak our language, should himself make out a written claim, present

it to the magistrate, obtain a summons, and himself serve it on the master by reading, or leaving an attested copy, attend to the hearing. and perhaps summon and examine witnesses, is a mere illusion. He has the right to do all this, and so has every man a right to institute and prosecute his suits at law, without professional assistance. But how often is this done. even by the most intelligent and educated? Not in one case in a thousand; and still more rarely would the common sailor enter upon legal proceedings. He always employs a proctor, who must be paid, as must also the commissioner or justice. when they are resorted to, and the officer who may serve the summons. It is true, costs may be given to the seaman, where the master is in the wrong, but it is well known, that the highest taxation falls far short of the charges of the proctor alone. It may be added, that if it be not optional with the seaman, whether to resort to this procedure by summons or not, there is a want of reciprocity, for it is entirely optional with the master, whether to take any notice of it or not, and his refusal to do so, only leaves him liable to have a suit commenced against the vessel; that is. in the same situation as if this provision for a summons had never existed. On the whole. I see no reason for extending these provisions impairing the previous rights of seamen. further than is required by a fair construction of the language used by the legislature. And I am of opinion, that it is optional with the seaman, whether to resort to the preliminary measure of summoning the master, or to make direct application for admiralty process.

In conclusion, the right of a seaman to his wages is perfect, upon the completion of his service; and before the statute, if payment was refused, he could have instantly commenced a suit in personam, against the owners or master, or in rem, against the vessel or freight. The statute affects only one of these remedies, viz., against the vessel. It does not touch suits in personam. or against the freight. By the statute, as a general rule, no proceedings can be had against the vessel. until ten days after the right to wages has accrued. But there are three events in which such proceedings may be had within the ten ways, viz.. if a dispute has arisen, if the vessel has departed from the port of her discharge. or if she is about to proceed to sea. In the last two cases the statute is inoperative, and the right to process is the same as if it had never been passed. The expiration of ten days, and a dispute having arisen. are by the act made equivalent to each other, and upon the happening of either. the new proceeding by summons to the master, is authorized. but not required. The act is. in this respect, permissive, not imperative. The judge may order process against the vessel. without previous summons to the master  In the absence of the judge, the clerk may issue process, according to rules prescribed, or instructions given by the judge. Decree for libellants for $386.82, and costs.